v. Gleason Industrial Products, 2009-1103. Mr. Schaefer will be ready when you are. Thank you, your honors. May it please the court. The parties in this case agree that Taifa was required to demonstrate irreparable harm to Taifa, resulting from the liquidation of the entries that were part of the subject of the underlying review as a prerequisite to obtaining the preliminary injunction that it sought. Taifa failed to do so. Taifa isn't liable for any duty assessments and it hasn't identified or quantified any other economic harm that it may suffer if the entries are liquidated. So Taifa and the government both argue that if the underlying entries are liquidated... Why aren't we just suspending the liquidation to permit a review here? I'm not sure I understand your question. Why isn't the court imposing this injunction just to permit further review of the case and keeping everything in status quo to prevent the liquidation from halting that further review? Well, it's a purely procedural matter. Why isn't it proper in that context? Because the liquidation doesn't, in fact, halt the further review, which I think is the point that this court's decision in Gerdau Maristil stands for. There is a challenge to Congress's methodology. That challenge affects a number of other substantive issues, most notably Taifa's deposit rate. And that challenge can proceed whether the entries are liquidated or not. And so a preliminary injunction certainly isn't required for the court's review to continue. And there are many cases where... I'm confused by what you're saying now. I thought that if the entries were liquidated, the money was paid over. It narrowed the scope of permissible appeal at that point of the underlying duty rate that was assessed. Is that not true? Doesn't it narrow substantially the scope of what you may then appeal? I'm not sure that it does, Your Honor. I think the scope of what Taifa is appealing is Congress's determination and its calculation of the rate. That rate has implications for a number of different things, one of which is the entries in the review at issue. So maybe you're saying in this case, they would be able to take this issue forward on appeal still, even if there was a liquidation? Is that what I'm understanding you'd say? Your Honor, I think in any case where... But in many cases, there's a whole panoply of issues they'd like to appeal. It's not narrow like this case. And when you liquidate, when they're already liquidated, I guess I just understood from Zenith and Irvine, I'm probably saying it right, several of our prior precedents, that once the liquidation occurs, the universe of what is appealable is substantially narrowed. I don't think that's so, I think that's a function of the facts in those cases. Part of why Zenith doesn't apply here, in fact, is that what was at issue in Zenith was these entries by themselves. Zenith was saying, if these entries are liquidated, the commercial impact of that will be dire for us. We will suffer. And our only relief is to ensure that they're liquidated at the appropriate rate. If they're liquidated at a rate that's too low, we will suffer. And so if they're liquidated at that rate before we can effectively complete our appeal, we've lost any meaningful review that we have. That's not the case here. If these entries are liquidated, the issue of TIFA's deposit rate remains live. And in point of fact, that's really- Can they get the money back? I mean, if they're liquidated at the wrong rate, can they get that money back? Well, they can't get that money back anyway, Your Honor, because it's not their money. TIFA didn't deposit those duties and it's not responsible for the assessment. Can the importers get the money back if the things are liquidated? Because obviously, if the importers have to pay a higher liquidation rate, they're not going to be as eager to buy this product. This has to have an effect or you wouldn't be here and they wouldn't be here. So denying the effect is kind of- Well, I think it has an effect, Your Honor, but the question is whether it has an effect on time. I don't doubt that the importers are very concerned with this issue, but by not having participated in the underlying administrative proceeding, they forfeited their right to bring any appeal. There's no question that the importers care, but that's different from saying- We're looking here at a procedural action by the trial court in which he sees some need for further review. How has he abused his discretion? Because we have to find he's abused his discretion in taking this procedural step to preserve the status quo. Pretty standard sort of thing for trial courts to do. Where's the abuse of discretion? Well, there are at least two instances of abuse of discretion, Your Honor. First, the trial court presupposed that the Zenith case applies here. And for the reasons that I've outlined, in fact, it doesn't. It was an entirely different situation. So why is it that you said Zenith doesn't apply because these are not domestic producers? Let me back up for just a moment, Your Honor. The statute says interested parties, so that covers everybody. It's not limited to US parties. It's- It's not limited in terms of their ability to bring an injunction. And we've never argued that they don't have that ability, but that's subject to the requisite showing that they have to make. Now, what Zenith said was a domestic producer who has spent a year convincing the International Trade Commission that entries of less than fair value merchandise are injurious needn't, again, show that to the Court of International Trade satisfaction when it's bringing a case to prevent liquidation at, again, a less than fair value rate. You can't get really very far by attacking the Zenith citation. It was a seaside. She didn't say Zenith controls. She just mentioned it in passing. Well, I don't agree, Your Honor. I think what she said was that the competitive injury concerns that were in Zenith are no less applicable here, and that's simply not so, because the competitive injury concerns that were at issue in Zenith were the competitive injury concerns that a domestic producer faces when contending with less than fair value imports, which have already been proven to be injurious. We don't have that situation. So the Zenith concerns you would acknowledge would be present if this was the importers involved in this case as opposed to the ex- If it were the importers involved, it would be clearer still, because it wouldn't be the oblique commercial harm that the Zenith case was contending with. It would be the money. The importers would be seeking to ensure that they don't have to pay. TIFA doesn't have that burden. There's no question that it's going to have to pay. It won't. But TIFA's interested in selling to importers, and if importers are going to get charged a lot more money in duties, they're not going to want to buy from TIFA. Absolutely. So why do they not have a competitive injury? Well, they do have a competitive injury, and that's why TIFA's challenge to the deposit rate remains live and is so important, and that's why we're puzzled when TIFA and the government say that if the entries are liquidated, any other relief that we can get is hollow. If you are staring down the barrel of a 383% anti-dumping deposit rate, and that's the rate that you have to contend with prospectively, that is commercially catastrophic. And so to be able to reduce that rate is far from hollow relief. And in fact, it's much more significant than any relief that you could secure by way of altering assessments on entries for which you won't have to pay. Do you want to save the rest of your time? Yes, please, Your Honor. Ms. McCarthy, you're splitting your time with Mr. Mastriani. Yes. I'll leave it to you to decide when to stop.  I'll do my best, Your Honor. In a case littered with quixotic questions, the biggest one is, why does the government argue waiver alone? Well, there was a procedural argument we made because the- Particularly when the court granted the injunction even before the period to intervene had expired. So how could they have waived something they still had time to even act on? Well, I think our position is more consistent with what the common practice of this developed in light of the passage of 1516A, this court's precedent in Zenith, and this court's precedent most recently in Yongchen, which has developed as a very common practice of consenting to injunctions. The United States normally does not consent to injunctions, as this court, I'm sure, understands. We do in this case because these are statutory injunctions. This is a very special, specific statutory injunction under 1516A. And particularly in light of this court's precedent in international trading, which creates a time problem for deemed liquidation of entries, commerce has a policy where it will issue liquidation instructions after 15 days, which means that the process is very accelerated in the front end. We normally get complaints. When we get receipt of complaints, we get a motion for preliminary injunction. But the time limits don't apply? Well, the time limits apply. But Gleason, in this case, had service and notice of the motion for preliminary injunction. And time left to respond if they wish to. And you say they waived? Well, they had to intervene. They had to intervene if they wished to oppose the injunction, which is an issue. They had time left to do that, and you still say they waived? Well, they didn't act within the common timelines. In any event, Judge Gleason did. They didn't act like everybody else. They read the statute and acknowledged their time limits. It's just a strange position. Well, they didn't have any. Until they intervene, they don't have an ability to, they don't have any standing to object to the injunction. They did timely intervene, and they filed a motion to dissolve the injunction. In any event, Judge Rustani, below, didn't really decide the issue whether it was a motion for reconsideration or whether it was a motion in opposition to the first instance. This court clearly has jurisdiction to entertain her order denying the motion for dissolution. So the issue is whether this court reviews it on an abuse of discretion or an abuse of discretion plus, as she said, as Judge Rustani said below, the injunction stands under either standard of review. But I'm delighted to argue why Judge Rustani didn't abuse her discretion in denying the motion to dissolve. The reason why is because, as she said, this is a normal injunction under 19 U.S.C. 1516 A, E, AC 2, and she did not grant the injunction as a right, as Gleason said. She did apply the four factors, and in this case- Likelihood of success. How does TIFA meet that? This is the unique situation created by the 1516 A, E framework, and we are very mindful of the Supreme Court's precedent in Ebay and in Munoff versus Gerrans. And in Munoff in particular, the court said that there must be a demonstration of likelihood of success in the merits. We disagree with Gleason because we believe that the same rationale for Zenith in terms of irreparable harm applies equally to the foreign producer and exporter. And so regardless, even if there is the most minimal possible consideration of- How can TIFA win? What's their real likelihood of success here? In our view, we do not concede likelihood of success. We do not believe they demonstrate a likelihood of success. We think nonetheless under the four factors because of the overwhelming specter of irreparable harm. And the specter of irreparable harm is in two instances. First of all, as counsel for Gleason noted, it's a 383% dumping margin here. You're really asking us not to apply Ebay, aren't you? No, we're trying to harmonize. We spent a lot of time, the Department of Justice, we spent a lot of time to harmonize our position with Ebay. But this court's position pre-Ebay was very similar to what you're saying to us now. We're saying a property right is inevitably trust upon once you've found infringement. Therefore, that irreparable harm trumps any difficulty with the likelihood of success. That kind of was the court's position. And the Supreme Court rolled that back. Yes, Your Honor. We've studied that very carefully. And I think the difference is- Now you're making the same argument to us. Great irreparable harm here. So we should overlook the likelihood of success. Because first of all, in the Padden Act, there wasn't a specific remedy provided for in the act itself. There was a right. There was a clear right that the Supreme Court discussed and the concurring opinions too. But there's a clear remedy provided in the statute here. Secondly, there's a complex, comprehensive scheme of administrative and judicial review. That will not be effectuated absent an injunction. Because not only would, if the entries at issue here were liquidated, it would be a 383% rate, which would have a clear economic effect on TIFA because it would be losing sales. And TIFA's counsel would probably speak to that better than I could. Secondly, this case will become moot in December because whatever lingering case or controversy would exist in the aftermath of liquidation would become extinct because the next administrative review and the cash deposit is likely to be reset in December. So the case wouldn't be entirely moot. Counsel, is it true that there is no difference in the scope of appealability once the entries are liquidated? I was having a discussion with the opposing counsel and he suggested that the rights of appeal are completely unaffected by liquidation. And that's what this preliminary injunction is all about, right? Not forcing the liquidation right now. Well, in terms of the issues that may be appealed, well, it will if an entire live case and controversy is extinguished, then yes, of course, all issues will be no longer subject to appeal. So the merits of the TIFA's claims would be extinguished entirely. I think Lisa was making the point that even though if the entries were liquidated, the final assessments of those particular entries would be final and there wouldn't be any chance for which the statute provides. If it turned out that commerce's rate were too high, there wouldn't be any chance for a refund of the entries to the importers who aren't participating here plus interest. That would never be effectuated. But it could have other effects for resetting the deposit rate or as this court held more recently in Judo and Ameristeel, if there were an issue regarding ratification, you could use the judicial determination for some other effect in another proceeding. So in terms of that, I think if you're wondering, I was asking if it would issue X, Y, or Z, would there be a narrowing of those issues? Not necessarily unless the entire case were to become moot. In this case here, there is an administrative proceeding that will reset the cash deposit rate. So even under Gleason's reasoning, any potential live case of controversy would be extinguished. But still, in terms of going to the, and I'm running over my time because I would like some time to counsel for TIFA, but to be clear, the heart of this court's analysis in Irreparable Harm and Zenith was that the injunction is necessary to provide a meaningful judicial review. And if the entries that are subject to this action are finally assessed and finally liquidated, and there's no chance for any recourse, then the economic effect on the interested party, and Congress has clearly provided that exporters, importers, and domestic parties all have economic interests and have standing to obtain judicial review, that that will be thwarted. And that's the irreparable harm, really, that this court mentioned in Zenith. And it applies with equal force to the domestic industry, which also does not pay cash deposits as it does to the foreign producers and exporters. And if there are any further questions, I'd like to turn my time and ask that the court's order will now be affirmed. Thank you, Ms. McCauley. Mr. Mastriani. Good morning. May it please the court. This clearly is a case that arises out of the anti-dumping laws, which are trade remedy laws. So they're very different from patent actions. They're different from habeas corpus actions like in Munaf. I could make a pretty strong argument that an infringed property right under the Patent Act would erect a higher compulsion for an injunction without proof of likelihood of success than this, a procedural matter. So why are we arguing that we should disregard eBay? You're not being asked to disregard eBay. eBay matters to us. Well, you're saying, OK, this is different than eBay. You're saying, you are telling us, don't strictly apply eBay. Because if we strictly apply it and look for a likelihood of success, you're going to have trouble, aren't you? No. No, I disagree. Oh, you've got a likelihood of success? Yes, Your Honor. First, I want to just point out, immediate irreparable harm is a conclusive presumption in these cases. Well, as it is with a patent. It's infringed. It is also a conclusive presumption that liquidation will harm the public interest. As there is with an infringed patent. And on likelihood of success, we made out in our complaint, and the court recognized, that because the Commerce Department indisputably found a lack of de jure and de facto control of TIFA by the Chinese government, that therefore, the PRC entity-wide rate, 383%, cannot apply. This court so held in the Sigma case. So you've got a 383% rate vis-a-vis a 3.83% rate or a 2% rate that TIFA was assigned in the preliminary. So you've got this tension, which is huge, between a rate that was put in the petition based upon smoke and mirrors, as Judge Gustavi recognized. Or was it based on a reluctance to cooperate with the procedures? No, Your Honor. As is evident from the record, TIFA produced all requested information, and all requested information was ultimately verified. The decision made after the fact by the Commerce Department, as to the fact that TIFA did not cooperate or was difficult in cooperating. The employees were sneaking out with stuff in their pockets and saying, it didn't exist. Your Honor, the- How is that cooperative? They got caught, and they did ultimately have to give it. But that doesn't mean they were cooperative. That's correct, Your Honor. But the point is, is that the statute- Let me try this. Doesn't work with them either. Well, we went through a spirit law argument with Judge Gustavi about this, and she acknowledged that the TIFA employees came clean. But importantly- No, no, no, they didn't come clean. They were caught. Yes, but they gave the information. But you have to put that aside because you're reacting emotionally. Congress says, and this court has said, and the CIT has said, that the statute is remedial. It's not punitive. The way, if you want to punish, if Commerce wanted to punish TIFA, the verifiers should have got up and walked out and got on a plane and flown home. They didn't. They persevered. They got all the information. It was all verified. And that also begs the question that I just raised before. Those, let's call them shenanigans, on insubstantial matters for a period that's outside the review on non-scope merchandise, do not at all detract from the fact that there's a lack of de facto and de jure control, which means that the PRC-NUI rate is a matter of law and precedent cannot apply. There were other things that the government requested that you all were not able to produce because those things seek to exist or you claim not to have them. How is the government to be assured in light of the fact that you made this claim and were secretly pocketing stuff and running out the door? How in the world is it to be believed, necessarily, that all the other stuff that you didn't have didn't produce or whatever? How do we believe that you're cooperative? And it's not my job to believe it, but the government decided that you weren't. I understand. Because you're getting into the meat of the matter that's before the court of international trade actually based upon the merits. This sort of goes to the likelihood of success. All of this, doesn't it? I mean, you don't have to decide. That I disagree. I could not disagree more with that because, as I said, if you accept the fact that is indisputable that there was a lack of de facto and de jure control, then, therefore, the PRC any wide rate cannot apply, which means it has to be remanded back to commerce for a recalculation. But the important thing is there were two classes of information. There were warehouse out slips and some production slips in 2008 that were looked at, and they wanted to see them to test whether they existed back for the period. And yes, there was some confusion and difficulty. There was some hiding of documents because they were thought to be outside the period. But they were given over 100%, and they all tied. The production sub-ledger was used to tie every single transaction. So, counsel, just so I understand, I had a conversation with government. I had a conversation with the police attorney. Is it true? Help me understand. Is there irreparable harm if the PI is not granted? If liquidation were to go forward in the absence of the PI, how would it have to be harmed? It would be harmed because it would be denied. It's a right to effective judicial review, which Congress mandates, and so did the court in Zenith. So does that mean because once the entries are liquidated, we would not then be able to appeal the right that was used for them? Your Honor, Section 516A says that Congress intended interested parties to request and be granted an injunction suspending liquidation during the pendency of an appeal so that entries would not escape the accurate assessment of anti-dumping duties. And this court said in Zenith, the inability of reviewing courts to meaningfully correct the review determination is irreparable injury that must be considered by the trial court, along with the other factors. Irreparable harm is a done deal here. It is conclusively presumed. So if TIFA is denied its right to effective judicial review, and it's knocked out of the US market, and Judge Rustani recognized that as a foreign producer is just as affected by competition issues as a domestic producer would be, then that's also economic harm. Plus, you have the economic harm done to the consuming public, who have to be faced with 383% duties loaded onto products that they may buy that should have been assessed at a far lower rate. So I don't see how any reasonable person could say that there is no irreparable harm here. And the fact of the matter is that there are no issues in this case that are being looked at for future issues like revocation, de minimis rates to result in revocation of an order. This appeal is strictly limited to the annual administrative review in question. That's it. Thank you, counsel. Thank you, Your Honor. We'll hear whatever rebuttal Mr. Schaffer has. Judge Rustani's been doing this for years. She understands the balances and what needs to be done to preserve the status quo. Why would we intervene and substitute our judgment for hers, saying that she abused her discretion? Well, because she clearly applied the wrong test, Your Honor. She used the wrong legal framework. And I'd like to back up for a moment and explain a little bit about that and about what this case is about, which will, I think, clarify why Taifa's argument doesn't make any sense. Commerce calculated a 383% rate. That has two separate and very distinct implications. One is for the past entries that were made during the period of review by importers who are not Taifa. The other is for the deposit rate going forward that importers have to pay on merchandise they bring in from Taifa from here on out. This injunction relates only to those past entries. If it's not granted and the entries are liquidated tomorrow, a bunch of importers are going to get bills. Taifa won't. It won't have to pay anything. It won't have to do anything. It's not clear that it'll even know that it happened unless somebody tells it so. It's challenged the commerce's methodology that resulted in this deposit rate will go forward. The application of that deposit rate is not even part of the injunction. But you don't think the importers are going to hold that against Taifa in future commercial dealings? It's going to get passed on to them somehow. Come on. Well, first of all, again, Taifa remains subject to a 383% rate. So I'm not sure what the importers' views as to Taifa are going forward make that much difference. It's crippled by a 383% rate. The fact that the importers get stuck with old bills doesn't do much to change that one way or another. As to what that harm will be, I have no idea what that harm will be. Perhaps Taifa can ship elsewhere. Perhaps Taifa can turn to its domestic market. The CIT's precedent says that just wringing one's hands and asserting that the harm is going to be grievous is insufficient. There has to be at least some quantum. Perhaps the U.S. market only accounts for 3% of Taifa's sales. Or perhaps it's 97%. Which are exactly the sort of facts that should have been teased out and that weren't. Again, we're not taking the position that no one in Taifa's situation can possibly satisfy the requirements for getting a preliminary injunction. We're saying only that Taifa failed to do so. Now, the government says that this is a normal practice. They don't concede any likelihood of success on the merits, but the irreparable harm is so severe that that outweighs the fact that there's no likelihood of success. Now we've got the government and Judge Rustani telling us that this is the right thing to do. Well, Your Honor, but you also have- Where's the abuse of discretion? Because you also have case law that says, first of all, if there's no likelihood of success on the merits, it doesn't matter how severe the irreparable harm is, for a start. Second of all, you still have a situation where the government says there's no likelihood of success on the merits, and Taifa can't show how it's going to be harmed. All they do is say, we'll be denied our right to relief. But the question is, what relief? They won't be able to get back the import duties paid on those entries that were made, but they can't get them back anyway. They didn't pay them. They won't have to. The only relief that the CIT can grant Taifa in this case is an adjustment to Taifa's deposit rate. That is unaffected by their preliminary injunction motion, and if the entries are liquidated, their challenge to that deposit rate can move forward apace. The government recognizes this, and what they say is, well, yeah, but another cash deposit rate in another review may come up and render the case moot. There are a couple of problems with that. First of all, as a factual matter, there have been two reviews since the one that underlied this case. Taifa wasn't involved in either one. The next one's not slated to start until the beginning of 2010, and the final results won't come out until the spring of 2011. The case on the merits here in the CIT has already gone to briefing an oral argument, so the idea that the rate that comes in the spring of 2011 will intervene in this case to cause a mootness problem, factually is unsustainable. Second of all, the Torrington case that we cited in our brief says that this would be a textbook example of a case susceptible to repetition but evading review. In other words, the litigation can't keep up with the speed of the administrative reviews. So even if somehow this case hung around the CIT long enough that a subsequent rate were to intervene under Torrington, their challenge to commerce's methodology could still go forward. So they won't be denied. Liquidation doesn't deny them any relief that they could otherwise get, which was the point that we made right from the start. Thank you, Mr. Shea, for the case. It will be taken under advisement. All rise.